Mike ROLLINS, Plaintiff,

v.

MISSOURI DEPARTMENT
OF CONSERVATION,
et al., Defendants.

No. 02–4271–CV–C–NKL.

United States District Court,
W.D. Missouri,
Central Division.

April 14, 2004.

David J. Moen, Law Office of David J. Moen, Jefferson City, MO, for Mike Rollins, Plaintiff.

James N. Foster, Jr., McMahon, Berger, Hanna, Linihan, Cody & McCarthy, St. Louis, MO, for Missouri Department of Conservation, Clarence Homan, Defendants.

Stephen B. Maule, McMahon, Berger, Hanna, Linihan, Cody & McCarthy, St. Louis, MO, for Missouri Department of Conservation, Clarence Homan, Defendants.

ORDER

LAUGHREY, District Judge.

Pending before the Court are two motions. The first is Defendants Missouri Department of Conservation ("Department") and Clarence Hohman's ("Hohman") Motion for Partial Summary Judgment [Doc. # 21]. The second is the Defendants' Motion for Summary Judgment [Doc. # 25]. For the reasons stated below, the motion for summary judgment is granted while the motion for partial summary judgment is denied as moot.

## I. Factual Background

Solely for the purpose of the Defendant's Summary Judgment Motions, the Court views the facts in a light most favorable to the Plaintiff, accepting as true Plaintiff Mike Rollins' ("Rollins") version of the facts when they are disputed.

The Department hired Rollins in 1995 to work in the Maintenance Department. (Rollins Dep. at p. 30.) Rollins worked the night shift, and his job responsibilities were primarily general cleaning. (Rollins Dep. at p. 31.)

Rollins' co-workers included the following: Joseph Johnson ("Johnson"), an African American male;[1] Melvin Beck ("Beck"), a Caucasian male; Mike Grellner ("Grellner"), a Caucasian male; Dennis Propst ("Propst"), a Caucasian male; and Dale Morris ("Morris"). Rollins' immediate supervisor throughout his employment with the Department was Clarence Hohman ("Hohman"), Lead Maintenance Tech. (Rollins Dep. at p. 36.) Hohman is a Caucasian male. Other supervisors include the following: Jerry Goff; Gary Hofstetter ("Hofstetter"); Dave Erickson ("Erickson"); Terry McDaniel ("McDaniel"); Jerry Conley ("Conley"). Jackie Jackson ("Jackson"), an African American female, and Debbie Goff work in the Department's Human Resources.

## A. Rollins' Disciplinary Record

### 1. July 19, 1996

On July 19, 1996, the Department placed Rollins on disciplinary probation for his behavior toward another employee. (Def. July 19, 1996, Memorandum (hereinafter

"Ex. 1").) Rollins was supervising a summer employee. Rollins went to Hohman and informed him that the employee was not working. Hohman then went to talk to the employee. Rollins was initially standing outside the door listening and watching; the employee then closed the door in Rollins' face. "I was very angry at that point[,] and I went into the office and took off my belt and said something to the effect 'If you don't show some respect I will whip your young ass.'" (Rollins Aff. ¶ 6.) Hohman told Rollins to leave the office. According to Rollins, he left and never came back to the office. (Rollins Aff. ¶ 6.)[2] As a result of the incident, Hohman sent Rollins home for the remainder of his shift. (Ex. 1; Hohman Aff. ¶ 7.)

The Department, acting through McDaniel, placed Rollins on disciplinary probation for three months and warned that his performance must improve immediately or further disciplinary action could occur, including termination. (Ex. 1.) It appears from the record that Rollins successfully completed the probation period.

### 2. November 19, 1998, Night Shift Meeting (Oral Warning on December 2, 1998)

On November 19, 1998, Hohman was conducting a meeting with the night shift

---

1. The Court includes the race of the individuals if the record makes clear that information. The Court includes this information only because it may be pertinent to the race discrimination claims at issue in this lawsuit.

2. Hohman's Affidavit and the July 19, 1996, Memorandum discussing this incident lay out a different version of the facts. The memorandum states: "Recently, on the evening of July 9, you stouied [sic] into a closed-door meeting between Clarence Hoh[m]an, your supervisor, and a night shift summer employee. Upon entering[ ] the room, you began cursing the summer employee and removed your belt threatening 'to whip the employee.['] After Clarence asked you to go back to work, you left briefly but returned with more

verbal abuse and physical threats against the summer employee. At that point, your supervisor had to ask you to go home for the remainder of the shift." (Ex. 1.) Hohman's affidavit states, "On July 9, 1996, I was in a closed-door meeting with another employee. Rollins interrupted my meeting, came into the room, and began cursing at and threatening the employee. I told Rollins to leave but he came back and continued threatening and verbally abusing the employee. After he came back into the office I asked Rollins to go home for the remainder of his shift." (Hohman Aff. ¶¶ 4–7.) Given the posture of this motion, the Court accepts the Plaintiff's version of the facts.

employees. Rollins lost his temper and raised his voice toward another employee, Morris. Rollins noticed that Morris was staring at him "in a very strange way." Rollins asked Morris why he was looking at him like that. According to Joseph Johnson ("Johnson"), Rollins' comment was insignificant. (Pl.[3] Johnson Aff. ¶ 12 ("Rollins said something to a co-worker that did not seem significant to me.").)

Other employees present during the meeting felt uncomfortable. (Hohman Aff. ¶ 9 ("Rollins' actions were from out of nowhere and made me and other employees feel uncomfortable."); Grellner Aff. ¶ 12 ("With respect to an incident in 1998 involving Mr. Rollins' conduct at a staff meeting, I was present and observed Mr. Rollins become angry and raise his voice at another employee, Dale Morris. I felt uncomfortable with Mr. Rollins' conduct and believed he was out of line by his actions."); Goff Aff. ¶ 15 ("I spoke to the other employees who were present at the meeting and learned at least two of the employees were upset and uncomfortable about Rollins' behavior.").)

On December 2, 1998,[4] Jerry Goff, Assistant Operations Division Chief, issued Rollins an oral warning for his conduct during the meeting. Goff warned Rollins that further conduct of a similar nature would result in additional discipline, including discharge. (Def. Dec. 29, 1998, Memorandum (hereinafter "Ex. 2") ("At a night shift meeting, November 19, 1998, you were somewhat disruptive, as affirmed by all night shift employees, displaying traits of a temper control problem for which you were placed on disciplinary probation two years ago. The meeting ended without incident, but all present indicated your ac-

tions made them uncomfortable. Your actions were most upsetting to at least two employees who were present.").)

### 3. Sick Leave Memorandum

On July 24, 2000, Hofstetter, Maintenance General Supervisor, sent Rollins a memorandum laying out concerns regarding Rollins' use of sick leave and annual leave. Hofstetter wrote:

> In conjunction with the annual performance appraisals I review each employee's use of annual leave and sick leave. As a result of this review I have found what appears to be a pattern on your use of personal sick leave and/or family sick leave. You have used sick leave on several occasions the day before or the day after a holiday, the day before and/or the day after you go on vacation and numerous occasions on either a Monday or a Friday. When calculated, the percentage of sick leave you have used during these patterns amounts to approximately 60% of the total of your sick leave taken. Due to the pattern you have established in using your sick leave I find it necessary for you to begin providing me with a signed doctor's excuse for any personal sick leave and/or family sick leave which you desire to use for the next six months .... Failure to comply with this request will result in further progressive discipline action being taken which could possibly lead up to and include dismissal.

(Pl. July 24, 2000, Memorandum (hereinafter "Ex. C").)

### 4. August 24, 2000, Incident (Written Warning on September 12, 2000)

On September 12, 2000, Hofstetter issued a written warning to Rollins for ig-

---

**3.** Both the Plaintiff and the Defendants have submitted affidavits from Johnson. The Defendants' affidavit from Johnson was executed prior to the Plaintiff's.

**4.** The oral warning was documented in a memorandum on December 29, 1998.

noring his supervisor, Hohman, and calling Hohman a fool. (Def. Sept. 12, 2000, Memorandum (hereinafter "Ex. 3").)

The event leading to this written warning occurred on August 24, 2000. Hohman had instructed Rollins to close a door. Rollins did not close the door, although Hohman had told Rollins that he could set off the alarm by doing so. Rollins later called Hohman a fool. (Ex. 3.) Hohman responded by telling Rollins he looked silly.

Rollins' failure to follow his supervisor's order violated the Department's handbook that prohibits an employee from refusing to follow a supervisor's instructions. (Ex. 3.) His calling his supervisor a fool violated the Department's Code of Conduct that requires employees to treat co-workers with respect, courtesy, and dignity. (Ex. 3.)

Rollins wrote a reply to his written warning. He wrote on October 24, 2000:

> On August 24, 2000, Dennis Propst and myself were walking towards the lobby and saw the door open. I looked outside and saw Marlyn Miller from Fisheries bringing in some boxes, so I held the door open for him. Clarence Hohman was coming from the Runge Center and saw me holding the door open. Clarence didn't say anything to me about closing the door. I had told him that Marlyn had the door propped open. That was the only thing said. After Marlyn brought the boxes in, the door was closed. At no time did Clarence tell me to close the door. Later as I was walking down the hall Clarence called me silly and I called him a fool.
>
> Gary Hofstetter interviewed me about the incident. I explained the situation

and he didn't pay attention to what I said. At the time I didn't think of Dennis Propst being there. Only after I showed Dennis the letter, he told me he heard the whole conversation between Clarence and I. He said he never heard Clarence say anything about closing the door. Not once did I tell Gary that I wanted to put this incident behind me. I said that I was fed up with them not listening to me. The written warning I received was unwarranted because of the lack of information gathered ....

(Pl. October 24, 2000, Memorandum (hereinafter "Ex. A").)

In response to Rollins' memorandum, Hofstetter investigated the situation. (Def. Nov. 9, 2000, Memorandum (hereinafter "Ex. 4").) Hofstetter concluded that Rollins' additional evidence was insufficient to overturn the discipline. Hofstetter interviewed Dennis Propst. Propst said that he was present only for a short period of time and heard no words exchanged between Rollins and Hohman. Hofstetter concluded that there was "more than sufficient opportunity for [Hohman] to have discussed closing the door outside of [Propst's] direct presence." (Ex. 4.) Rollins contends that Hofstetter did not conduct a thorough investigation because he did not find the inconsistencies in Hohman's version of the events.

Out of this incident, Hohman received an oral warning on September 13, 2000, for telling Rollins that he looked silly.[5] (Hofstetter Aff. ¶ 4; Def. September 13, 2000, Memorandum (hereinafter "Ex. 5").)

### B. Rollins' Termination on July 9, 2001

On June 27, 2001, an incident occurred between Hohman and Rollins that led to

---

**5.** As with the previous "oral" warnings given to Rollins, this oral warning to Hohman was memorialized in writing. (Ex. 5.)

Rollins' termination. According to Hohman, he was checking lights in the building, one of his job duties. Rollins stopped him and accused Hohman of checking Rollins' area. Hohman told Rollins that he was not checking his area. Rollins then jumped in front of Hohman and prevented him from getting past him to continue to perform his duties. Rollins then let Hohman pass. Hohman entered an office area, and Rollins turned off the lights on Hohman. Hohman reported this incident to his supervisor, Hofstetter. (Def. July 3, 2001, Memorandum (hereinafter "Ex. 6").)

On July 3, 2001, Hofstetter spoke with Rollins to obtain his version of the events. Rollins told Hofstetter that he was not aware of any incident that involved Hohman. After talking with Hohman and Rollins, Hofstetter then recommended to his supervisor, Dave Erickson ("Erickson"), Administrative Services Administrator, that Rollins be terminated. (Def. July 6, 2001, Memorandum (hereinafter "Ex. 7").) In making this recommendation, Hofstetter wrote:

> Over the past Mike [Rollins] has exhibited negative working conditions towards Clarence [Hohman] as well as his co-workers.
>
> -In July of 1996 Mike was placed on "disciplinary probation" for an outburst of anger towards a summer employee;
>
> -In December of 1998 Mike was given an "oral warning" for an outburst during a night shift meeting;
>
> -In August of 2000 Mike was given a "written warning" regarding another incident involving his supervisor. Mike refused to obey a reasonable request to close the door at the front entrance to the Central Office. In addition to refusing to obey this request Mike also called his supervisor a "fool";
>
> -There are other incidents where Mike challenged his supervisor, but was not disciplined including: January 2001, the night shift was asked to do additional work in the auditorium and Mike requested annual leave on the night the work was scheduled. In April of 2001 Mike was given the check off sheet for using the carpet cleaning machine. Mike indicated he could not read the sheet because he did not have his glasses. Mike has used this excuse on several occasions and his supervisor has offered to read the information to Mike but he walks off and does not listen;
>
> -Mike has received performance appraisals in which he was marked "Below Normal" or "Inadequate" on "Getting along with fellow employees" and "Compliance with work instructions";
>
> -In June of 2001, Mike refused to sign his performance appraisal and to date has not signed a Confidentially Statement that all of the night crew including Clarence, the day crew including Don Barns, and the Rupee Nature Center crew including Kent Fischer have all signed.
>
> Mike continues to fail to foster an attitude of teamwork and cooperation with other employees. He seems to continually look for ways to antagonize and be disrespectful of his supervisor. Therefore I am recommending that Mike be terminated immediately.

(Ex. 6.) Erickson agreed with Hofstetter's recommendation to terminate Rollins, Erickson forwarded the recommendation onto Director Conley. (Def. July 9, 2001, Letter (hereinafter "Ex. 8").) Conley agreed with the recommendation of termination. Rollins was terminated on July 9, 2001.

Rollins wrote a letter to Conley in response and requested a more complete investigation of the situation. (Def. July

12, 2001, Letter (hereinafter "Ex. 9").) Rollins' states that he had "information to offer Mr. Hofstetter with respect to what really occurred on the evening of June 2[7], 2001, but Mr. Hofstetter never let me know what Hohman had alleged against me." (Rollins Aff. ¶ 21.) Rollins says that on June 27, 2001, he did not block the hallway, and he was unaware Hohman was present when he turned off the lights. (Rollins Aff. ¶ 19.)

## C. Allegations of Race Discrimination [6]

### 1. Melvin Beck's Use of a Racial Epithet

Grellner, a co-employee, told Rollins [7] that another employee, Beck, had used the word "nigger" on one occasion in 1994. Beck's statement was made before Rollins began working for the Department. (Grellner Aff. ¶¶ 3–7); Rollins Dep. at pp. 46–48 When it came to Jerry Goff's attention that Beck has used the derogatory word at work, Jerry Goff investigated by speaking with Beck and Grellner. (J. Goff Aff. ¶ 4.) Jerry Goff concluded that Beck did make the comment, and he admonished him for engaging in the conduct as it was strictly against the Department's policy. (J. Goff Aff. ¶ 5.) The outcome of this investigation was not reported to Rollins because he did not work for the Department at the time.

Rollins contends that the derogatory word was used more than once. For support, Rollins cites to his affidavit at paragraph 13. Paragraph 13 states, "No person ever got back to me about the statements of Melvin Beck using the word 'nigger' at work. As far as I knew, Beck was still making those statements." (Rollins Aff. ¶ 13.) He also cites to Johnson's affidavit at paragraph 4, which states, "Goff told me that he was aware that Rollins had complained about Beck using the word 'nigger' at work ...." (Pl. Johnson Aff. ¶ 4.)

In contrast, in Rollins' deposition, the Defendants' attorney twice, in questions, referred to Beck making the derogatory term on one occasion. (Rollins Dep. at pp. 46, 48.) Rollins did nothing to correct the assertion that Beck only used the term once. Also, Rollins never said that Beck used the word more than once throughout his deposition, even though the issue was discussed at length. (Rollins Dep. at pp. 52–57.) Grellner, the person who told Rollins about Beck's comment, states under oath, "On one occasion, I heard another employee, Melvin Beck, use the "N" word at the workplace. This occurred before Mike Rollins became an employee with the Department, I believe in 1994. Melvin

---

**6.** Certain allegations of race discrimination have not been addressed by the Court. In his affidavit, Rollins asserts that for six years he was allowed to go to lunch off the premises but in the fall of 2000, Hofstetter told him that he could no longer leave the property for his lunch hour. (Rollins Aff. ¶ 24.) Rollins states that, as far as he knows, he was the only employee forbidden to leave the property during lunch. (Rollins Aff. ¶ 24.) This paragraph contradicts Rollins' sworn deposition testimony when he stated that he had discussed all of the actions he thought showed race discrimination and the lunch had not been discussed. (Rollins Dep. at p. 97.) Since a party may not contradict prior sworn

deposition testimony via a subsequent affidavit, except in limited circumstances that do not apply here, the Court does not consider this allegation. *See Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361 (8th Cir. 1983). The same is true of Rollins' allegations concerning not being asked if he wanted to go skeet shooting. (Rollins Aff. ¶ 25.)

**7.** The timing of Grellner telling Rollins of Beck's comment is uncertain but at least prior to July 1999, two years before Rollins left the Department in July 2001. (Rollins Dep. at p. 47.)

made this comment about another African–American employee, Cleveland Porter, who Melvin believed the Department had hired instead of him a few years prior. I told Mike Rollins about this comment years later. I never reported Melvin's statement to any supervisory or managerial representatives of the Department." (Grellner Aff. ¶¶ 3–7.)

Rollins did nothing immediately after he learned of Beck's use of the derogatory term. However, Rollins did report the comment to Jackson, Employee Relationship Manager, in early fall 2000. According to Jackson, Rollins came to her with concerns that his supervisor, Hohman, was discriminating against him. Rollins based this on a comment that another employee, Beck, had made approximately five years prior to Rollins going to Jackson. Rollins provided Jackson with no other evidence of race discrimination.

Also, from the record it appears that Rollins complained to Erickson, "several years" prior to July 2002, that the same co-worker, Beck, had used a racial epithet "in a way that Rollins overheard."[8] (Pl. Questionnaire for Dave Erickson (hereinafter "Ex. E").)

Thus, the record supports, with all inferences in favor of the Plaintiff, that Beck used the racial epithet at least once prior to Rollins' employment and Beck later used the word again in a way that Rollins overheard. Both incidents were investigated by the Department.

### 2. Carpet Cleaning Checklist

At some point, the Department started requiring Rollins to complete a checklist when using the carpet cleaning machine. It took him quite a bit more time when he used the checklist. Rollins was the only one required to use the checklist. Grellner states that he was required to complete the same checklist. However, the Court accepts Rollins' version of the facts that only he had to do the cleaning checklist given the posture of the case.

### 3. Hohman Requiring Rollins to Complete Beck's Work

In 1998, Hohman became Beck's brother-in-law. As a result, Hohman was required to seek an exception from the Department to the prohibition against supervision of an employee by a family member. The Department granted Hohman permission to continue to supervise Beck. Rollins was given Beck's work to do when Beck was absent. Rollins states that this was because Beck was Hohman's brother-in-law. Propst and Johnson also had to perform Beck's work when Beck was absent. Jerry Goff states that Rollins began accusing Hohman of favoring Beck over the others, based on the familial relationship.

### 4. 2000[9] Christmas Party

In December 2000, Hohman asked Grellner and Propst, Caucasian employees, if they wanted to have a Christmas party with the night crew members. They did

---

**8.** Whether or not Rollins actually overheard the comment is confusing. In Rollins' deposition testimony and affidavit, Rollins never says that he actually heard the racial epithet used. (*See, e.g.,* Rollins Aff. 8; Rollins Dep. at pp. 46–52.) Yet, Erickson's questionnaire implies that Rollins overheard a co-worker using the term. In an abundance of caution, the

Court assumes Rollins overheard the word used.

**9.** Rollins' affidavit places this incident in December 2001. The Court believes this is a typographical error since Rollins was terminated in July 2001. The Court assumes this was in 2000, as Hohman's affidavit states.

not want a party. Hohman did not ask Rollins or Johnson.

### 5. Discipline

Rollins believes that his discipline was based on his race and discriminatory.

### D. Rollins' Complaints [10]

### 1. Complaint to Hohman in 1995

■ Within the first several weeks of beginning his job, Rollins told Hohman, that he was discriminating against him because of Rollins' race. Rollins did not explain to Hohman why he thought that. (Ex. F.)

### 2. Complaint to John Hoskins in Late 1997 or Early 1998

In late 1997 or early 1998, Rollins complained to John Hoskins ("Hoskins"), the Deputy Division Director. Rollins complained about racial discrimination by Hohman., but there is no evidence in the record documenting any examples of race discrimination or the reasons given by Rollins for his conclusion. Rollins gave of discrimination. After this meeting, no one reported back to Rollins about the result of any investigation of his complaint.

### 3. Complaint to Erickson Several Years Prior to July 2002

Rollins complained to Erickson, "several years" prior to July 2002, that a co-worker had used the word "Nigger" "in a way that Rollins overheard." (Pl. Questionnaire for Dave Erickson (hereinafter "Ex. E").)

Erickson asked supervisors to investigate, which they did. The co-worker denied making such a reference in Rollins' presence. (Ex. E.)

### 4. Complaint to Jackie Jackson in Early Fall 2000

According to Jackson, Employee Relationship Manager, Rollins came to her with concerns that Hohman was discriminating against him. Rollins based this on a comment that another employee, Beck, had made approximately five years prior to Rollins going to Jackson. (Jackson Aff. ¶ 4); Pl. Questionnaire for Jackie Jackson (hereinafter ("Ex.G").) Rollins provided Jackson with no other evidence of race discrimination. Jackson talked with Grellner and Propst on the night shift and found no evidence of racial discrimination. She also spoke with Johnson and he noted that Hohman was probably afraid of Rollins because of Rollins' behavior toward Hohman. After her investigation, Jackson concluded that she could not identify any evidence of racial discrimination by Hohman. She further concluded that Rollins did not like Hohman and did not like accepting orders from Hohman.

### 5. Complaint to Hofstetter at Dismissal

Hofstetter indicates that Rollins voiced a complaint when he was dismissed. (Pl. Questionnaire for Gary Hofstetter (hereinafter "Ex. H.").) Hofstetter asserts that this is the only time Rollins discussed discrimination with him. He said,

---

**10.** In his affidavit, Rollins asserts that he complained to Jerry Goff that he thought Hohman was harassing him. This affidavit contradicts Rollins' prior deposition testimony. In his deposition, Rollins did not include Jerry Goff as a person to whom he complained about harassment. As stated before, sworn deposition testimony cannot be contradicted by a subsequent affidavit to create a genuine issue of material fact. *Camfield Tires, Inc.,* 719 F.2d 1361. For this reason, the fact that the Court finds no other evidence in the record that suggests that Rollins complained to Jerry Goff, and that Jerry Goff's affidavit at paragraph 16 states that Rollins never complained to him about harassment, the Court does not include a complaint to Jerry Goff in this section.

Mike indicated years ago another employee used an ethnic term to Mike [Rollins]. This occurred before I came to MDC and I didn't have any ... history regarding this incident. Mike also stated at the time of his dismissal that he thought Clarence Hohman was prejudiced and a racist. Mike also mentioned he complained to Debbie Goff and Dave Erickson about Melvin Beck's use of a racist word. Again this was prior to my starting to work for MDC. I was told that the incident was investigated and there was not any conclusive proof that the incident did or did not occur.

(Ex. H.)

### 6. After Dismissal: Administrative Appeal of Disciplinary Action

Rollins filed an administrative appeal of his dismissal with the Department. (Pl. Dep't Admin. Appeal (hereinafter "Ex. I").) In this appeal, he wrote that his supervisor was discriminating against him on the basis of race.

## II. Summary Judgment Legal Standard

██ A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A defendant who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party and

the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir.1991) (citation omitted). The main purpose of a motion for summary judgment is to identify factually unsupported claims. If a plaintiff has the burden of proof at trial on a claim and the defendant has filed a motion for summary judgment, the plaintiff must identify admissible evidence sufficient to make a submissible case at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the plaintiff cannot identify such facts, the defendant is entitled to judgment as a matter of law. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (quoting *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548).

To establish a genuine issue of fact sufficient to warrant trial, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

## III. Discussion

### A. Motion for Summary Judgment [Doc. # 25]

██ Rollins has asserted four claims: 1) a race discrimination claim under Title VII and the Missouri Human Rights Act ("MHRA"); 2) a retaliation claim under Title VII and the MHRA; 3) a hostile environment claim under Title VII and the MHRA; and 4) a violation of 42 U.S.C. § 1983.[11]

---

11. The Court analyzes Rollins' claims under Title VII and the MHRA using the same legal

principles. *See Gipson v. KAS Snacktime Co.*, 171 F.3d 574, 578 (8th Cir.1999); *Swyers v.*

## 1. Race Discrimination Claim

■ Rollins argued that there is "direct" evidence of discrimination in this record. However, after the United States Supreme Court's Opinion in *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), the distinction between direct and circumstantial evidence has evaporated. In that case, the Supreme Court held that 42 U.S.C. § 2000e–2(m) does not require direct evidence of discrimination. A plaintiff need only show, by direct or circumstantial evidence, that defendant has engaged in a forbidden employment practice.

■ The full import of *Desert Palace,* is not yet clear, but it is settled that if an adverse employment action was motivated because of a plaintiff's race, gender, pregnancy, etc., even in part, a plaintiff is entitled to judgment, at least on the issue of liability. Thus, the focus should be on all evidence that supports a finding in this case that Rollins' termination was motivated in part because of his race. What is not clear is the continuing validity of the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), burden-shifting paradigm at the summary judgment stage. *See Allen v. City of Pocahontas,* 340 F.3d 551 (8th Cir.2003); *Dare v. Wal–Mart Stores, Inc.,* 267 F.Supp.2d 987 (D.Minn.2003); *Dunbar v. Pepsi–Cola Gen. Bottlers of Iowa, Inc.,* 285 F.Supp.2d 1180 (N.D.Iowa 2003); *Griffith v. City of Des Moines,* 2003 WL 21976027 (S.D.Iowa July 3, 2003); *cf. Davis v. Emery Worldwide Corp.,* 267 F.Supp.2d 109, 120 n. 2 (D.Me.2003). While this Court seriously questions the continued viability of the *McDonnell Douglas* burden-shifting paradigm, it will use it to analyze this case because the outcome would be the same whether it is used or not used at the summary judgment stage.

Rollins argues that he has met the three-stage burden-shifting paradigm first set forth in *McDonnell Douglas Corp.,* 411 U.S. at 802–04, 93 S.Ct. 1817. Under this framework, Rollins must first establish a *prima facie* case of race discrimination. *Putman v. Unity Health Sys.,* 348 F.3d 732, 735 (8th Cir.2003). If Rollins satisfies these initial burdens, the burden then shifts to the Defendants to rebut the *prima facie* case by articulating legitimate, nondiscriminatory reasons for terminating Rollins. If the case reaches that stage, Rollins then assumes the burden of producing evidence that the proffered reason was merely a pretext for discrimination.

### a. *Prima Facie* Showing

■ To establish a *prima facie* showing of race discrimination, Rollins must show that: (1) he belongs to a protected class; (2) he was qualified for the job; (3) he was discharged; and (4) after his discharge, he was replaced by a person with similar qualifications. *Putman,* 348 F.3d at 736. If, as here, a plaintiff is not replaced, then he must "present some other evidence that would give rise to an inference of unlawful discrimination." *Id.* A common form of evidence giving rise to an inference of unlawful discrimination is to show that similarly situated employees were more favorably treated. The Eighth Circuit has also held that evidence of pretext, which is normally considered only at step three of the burden shifting analysis, satisfies the fourth element of a plaintiff's *prima facie* case. *Id.*

The first three elements are met in this case. At issue is the fourth element. As discussed below, Rollins has not presented evidence that similarly situated employees

*Thermal Science, Inc.,* 887 S.W.2d 655, 656 (Mo.Ct.App.1994).

were more favorably treated, nor has he shown pretext for his termination. Thus, he has failed to establish a *prima facie* case. Even assuming that he has established a *prima facie* case, he has failed to rebut the Defendants' nondiscriminatory reason for his termination.

### b. Non–Discriminatory Reasons

The Defendants have met their burden of presenting legitimate, non-discriminatory reasons for terminating Rollins. The Defendants terminated Rollins because of his inability to control his temper and unwillingness to follow his supervisor's orders. (See Ex. 8.)

### c. Pretext for Discrimination

Rollins has the burden of producing evidence that the Defendants' proffered reason is merely a pretext for discrimination. *Williams v. St. Luke's–Shawnee Mission Health Sys., Inc.*, 276 F.3d 1057, 1059 (8th Cir.2002). Rollins must show:

> by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143–44, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

In part, Rollins argues that the Department's reasons are unworthy of credence because of his subjective belief that Hohman was racist (Rollins Dep. at p. 88), and because Hohman was afraid of African Americans, particularly Rollins. A plaintiff's general, subjective belief that the Defendants treated him differently because of his race is insufficient evidence to show

that the legitimate, nondiscriminatory reasons for terminating Rollins were lies used to cover the real reason for the termination. *Rose–Maston v. NME Hospitals, Inc.*, 133 F.3d 1104, 1109 (8th Cir.1998) (a plaintiff's unsubstantiated, general, and conclusory allegations are insufficient to support an inference of pretext).

Further, after a review of the entire record, the Court finds no evidence to support Rollins' theory that Hohman was afraid of African Americans. The record shows that Hohman and Rollins did not like each other. (Jackson Aff. ¶ 9; Ex. G.) There is one suggestion that Hohman was afraid of Rollins because of Rollins' behavior toward Hohman. (Ex. G.) But there is nothing in the record to suggest that Hohman was afraid of Rollins because of any reason connected to race. Rollins argues that Hohman's discriminatory animus is shown by Hohman giving Rollins less desirable job duties, criticizing him behind his back, and not consulting him regarding a Christmas party. Yet, Hohman criticized both Caucasian and African American employees. As Johnson stated, Hohman was simply a poor supervisor. (Def. Johnson Aff. ¶ 1.) Hohman made both Caucasian and African American employees cover Beck's job duties when he was gone. The fact that Hohman was treating both Caucasians and African Americans the same suggests that he was not motivated by race. Hohman's questioning of Propst and Grellner about a Christmas party, but not Johnson or Rollins, and Hohman's directive to Rollins to use a checklist when cleaning carpets, may create a theoretical inference that Hohman harbored a discriminatory animus. However, this thread of evidence is insufficient as a matter of law to rebut the Defendants' legitimate, nondiscriminatory reasons for Rollins' termination or to show pretext, particularly, given the strength of that evidence.

Rollins also argues that the disciplinary warnings he received leading up to his termination were fabricated to obscure the unlawful racially motivated reason he was terminated. Rollins asserts this is so because the supervisors that investigated the incidents, McDaniel, Hofstetter, and Jerry Goff, believed Hohman's version of the facts over Rollins' version. However, Rollins does not question the 1996 written warning, given by Jerry Goff, for physically threatening a summer employee.

 As an initial matter, employers have wide latitude to make business decisions. *LaCroix v. Sears, Roebuck, & Co.,* 240 F.3d 688, 692 (8th Cir.2001). When federal courts examine an employer's articulated reasons, they "do not sit as super-personnel departments to second-guess the business decisions of employers [rather] the threshold question is ... whether [the employer's] reasons for its employment actions are true, not if they are wise, fair, or correct." *Dorsey v. Pinnacle Automation Co.,* 278 F.3d 830, 837 (8th Cir.2002). When an employer articulates a reason for disciplining a particular employee, it is not the court's "province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason." *Wilking v. County of Ramsey,* 153 F.3d 869, 873 (8th Cir. 1998).

Rollins attempts to establish pretext by saying that the incidents were not as the supervisors found them. At the November 1998 meeting, Rollins argues that no one at the meeting felt threatened, and, therefore, the discipline is a cover. However, the evidence, with all inferences in Rollins' favor, shows that at least two employees felt uncomfortable and Rollins was disciplined for being "somewhat disruptive" and displaying traits of a temper control problem initially shown in 1996. (Ex. 2.) The Court finds no evidence con-

cerning this incident from which a jury could infer that the stated reasons in the memorandum were not the real reasons for the discipline.

 Next, Rollins argues the August 2000 discipline, issued by Hofstetter, shows racial discrimination in that Rollins was given a written warning for calling his supervisor a fool while Hohman was only given an oral warning, a less serious disciplinary action, for calling Rollins silly. Yet, Rollins has produced no evidence that Hohman and Rollins were similarly situated for comparison purposes. From the evidence in the record, Rollins had previously been placed on disciplinary probation and had already received an oral warning for the November 1998 meeting. Whereas, the record does not show that Hohman had previously incurred any disciplinary warnings. Similarly situated employees can form a basis for establishing pretext, but they must be "similarly situated in all relevant respects." *Ghane v. West,* 148 F.3d 979, 982 (8th Cir.1998); *see also Clark v. Runyon,* 218 F.3d 915, 918 (8th Cir.2000). Rollins has not met that burden here.

Rollins argues that the June 2001 incident that led to his termination is a pretext because Hofstetter did not credit his explanation that "nothing happened." From the record, it is unclear exactly what Hofstetter's conclusions about the incident were. The letter in which he recommends termination to Erickson merely says that there was an incident involving Rollins and Hohman. Hofstetter then attaches Hohman's documentation of the incident and a memorandum summarizing Hofstetter's interview with Rollins about the incident. Hofstetter makes no conclusion as to what occurred between the two. Assuming that Hofstetter believed Hohman's version of the incident and that Hohman's version of the facts is incorrect, this disbelief of Rol-

lins, without more, does not show that Hofstetter disbelieved Rollins because he was intentionally discriminating against him based on his race. There is no allegation that Hofstetter was racially biased, no conduct or statements by Hofstetter from which a jury could infer racial bias, and Rollins did not complain of discrimination to Hofstetter until after his termination. Hofstetter's disbelief could be based on any number of reasons (*e.g.*, the fact that Rollins only told Hofstetter that nothing happened instead of telling his version of the facts as now set out in his affidavit). Rollins has not met his burden of producing evidence from which a reasonable jury could infer Hofstetter's disbelief was based on race and that the real reason for his termination was race.

Rollins may also be arguing that the Defendants' tolerance of a racial epithet in the workplace prior to Rollins' employment shows that the reasons given for his termination were pretextual. Yet, Jerry Goff investigated the incident at the time, and Beck was orally disciplined for using the inappropriate word. Erickson also investigated the use of the word when Rollins reported it to him. Jackson also investigated when Rollins complained to her of racial discrimination based on the racial epithet being used in the workplace. Rollins has not produced any evidence that connects the use of the racial epithet to the reasons he was terminated. No person in the chain of command is alleged to have made such a statement and when they learned of it, they investigated and took action.

Finally, assuming for the moment that Hohman was afraid of Rollins because of his race, Hohman did not make the decision to terminate him, contrary to what

Rollins asserts. Hofstetter, not Hohman, decided to recommend to Erickson that Rollins be terminated.[12] In fact, Hohman recommended that Rollins only be given an oral warning. (Pl. Draft June 28, 2001, Memorandum (hereinafter "Ex. J").) Hofstetter did not agree and instead recommended that Rollins be terminated.

When looking at the record as a whole, Rollins has not presented evidence from which a reasonable jury could conclude that the real reason for his termination was discrimination based on race. Accordingly, the Court grants the Defendants' request for summary judgment on this claim.

### 2. Retaliation

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show: (1) he engaged in activity that is protected under Title VII; (2) an adverse employment action was taken against him; and (3) a causal connection between the two events. *Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1136 (8th Cir.1999). Rollins meets the first two elements of the *prima facie* case: he complained about racial harassment and the Department terminated him. The issue is whether there is a causal connection between these two events. Because the Court has found that no reasonable jury could conclude that the Defendants' legitimate, nondiscriminatory reasons for the termination were pretextual, it also grants summary judgment on the retaliation claim.

### 3. Hostile Work Environment

To establish a race based hostile environment harassment claim, a plaintiff must demonstrate the following ele-

---

**12.** Erickson then recommended to Director Conley that Rollins be terminated. Conley wrote Rollins' termination letter.

ments: 1) he is a member of a protected class; 2) he was subjected to unwelcome race-based harassment; 3) there is a causal nexus between the harassment and his race; and 4) the harassment affected a term, condition, or privilege of employment. *Elmahdi v. Marriott Hotel Services, Inc.*, 339 F.3d 645, 652 (8th Cir. 2003). The complained of conduct must be sufficient to create a hostile environment, both as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim. *Elmahdi*, 339 F.3d at 652; *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Relevant factors for determining whether conduct rises to the level of abusiveness include: (1) the frequency of the conduct; (2) its severity; (3) whether the conduct is physically threatening or humiliating, or merely an offensive utterance; and (4) whether the conduct unreasonably interferes with an employee's work performance. *Duncan v. General Motors Corp.*, 300 F.3d 928, 934 (8th Cir.2002), *cert. denied*, 538 U.S. 994, 123 S.Ct. 1789, 155 L.Ed.2d 695 (2003); *Bradley v. Widnall*, 232 F.3d 626, 631 (8th Cir.2000). The standards for judging the hostility of the working environment must be sufficiently demanding to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (internal quotation omitted). The evidence must establish more than a few isolated incidents, and there must be proof that the alleged harassing conduct "was so intimidating, offensive, or hostile that it 'poisoned the work environment.'" *Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958, 967 (8th Cir.1999).

■ Rollins has failed to show that the harassment affected a term, condition, or privilege of employment. The conduct Rollins complains of includes the isolated use of derogatory terms in the workplace, and the Department's failure to investigate Rollins' complaints. These items, when considered separately and in conjunction with each other, do not come close to showing a hostile work environment.

As for the use of the racial epithet, the term was used by Beck, a co-worker, at least once prior to Rollins' employment. When it became known to the Department, Jerry Goff investigated. Jerry Goff concluded that Beck did use the racial epithet, and Jerry Goff admonished Beck for engaging in the conduct as it was strictly against the Department's policy. However, Beck's use of the word prior to Rollins' employment with the Department could not have had an impact on a term or condition of his employment. On one other occasion, Beck again used the term in a way that Rollins overheard. Thus, at most, the term was used once in a way that Rollins overheard. While the use of the word is offensive, the record does not show that Rollins was physically threatened or humiliated. The use of the word did not interfere with his work performance as it was only said in his presence once.

This case is similar to *Elmahdi*, 339 F.3d at 652. The plaintiff in *Elmahdi* was called "boy" and "black boy" on a few occasions over a period of years, and a supervisor once referred to Africans as having big penises. *Id.* at 652–53. While offensive, the Eighth Circuit held that the statements did not constitute a "steady barrage of opprobrious racial comment" sufficient to support a section 1981 hostile work claim and affirmed the entry of judgment as a matter of law. *Id.* at 653.

Rollins' case is also analogous to *Burkett v. Glickman*, 327 F.3d 658 (8th Cir.2003). In *Burkett*, the plaintiff alleged she was subjected to a hostile work environment because she was present when racially prejudicial remarks were made. *Id.* at 661. The plaintiff could not establish, however, when the remarks were made or where they were made. *Id.* Although a co-worker testified the plaintiff's supervisor occasionally used the derogatory word "Nigger," the Eighth Circuit concluded that such remarks were "off hand," "isolated," and insufficient to establish a hostile work environment.

Rollins also argues that the frequency of his complaints about racial discrimination and the lack of investigation shows that racial discrimination permeated the work environment. Rollins complained four times (to Hohman, Hoskins, Erickson, Jackson) over his six years of employment. When he complained to Hohman and Hoskins, it is unclear from the record whether an investigation was undertaken. The Court presumes one was not done. When Rollins complained to Erickson and Jackson, they investigated and determined that no racial discrimination occurred. In his complaints to Jackson and Erickson, Rollins' example of racial discrimination was Beck's use of the racial epithet. Given the paucity of complaints and the lack of specificity and support for the complaints, the Department's response to the complaints is not sufficient to establish a hostile environment.

The Court concludes that no reasonable jury could find that Rollins' allegations are sufficient to show that a term, condition, or privilege of employment were affected. Accordingly, the Court grants the Defendants' request for summary judgment on Rollins' hostile environment claim.

**4. 42 U.S.C. § 1983 Against Hohman**

 The Fourteenth Amendment prohibits intentional discrimination on the basis of race or gender by a state actor. *Okruhlik v. Univ. of Ark. ex rel. May*, 255 F.3d 615, 625 (8th Cir.2001). The elements of a claim of intentional discrimination are essentially the same under Title VII and the Constitution. *Id.* Rollins claims that his equal protection rights were violated by Hohman's intentional racial discrimination, retaliation, and creation of a racial hostile work environment.

Hohman is entitled to qualified immunity from civil liability if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Tuggle v. Mangan*, 348 F.3d 714, 720 (8th Cir.2003). When ruling on qualified immunity, a Court must answer two questions. One, do the facts, when viewed in the light most favorable to Rollins, establish that Hohman violated a constitutional or statutory right? Two, was the right clearly established?

 As to Rollins' claim that Hohman intentionally discriminated against him based on race, the Court concludes that Hohman's conduct does not violate a clearly established statutory or constitutional right. Hohman never said any derogatory statements in front of Rollins. Nowhere in the record does anyone accuse Hohman of saying anything racially derogatory. Instead, the record is full of evidence that Hohman was a poor supervisor. Hohman criticized Rollins and Johnson behind their backs but also criticized the other employees, who were white, behind their backs. Hohman made Rollins and Johnson take over Beck's work, but he also made Propst, a white employee, do Beck's work. Even Rollins indicated at one time that he believed the extra work was based on Hohman's familial relationship with Beck. Hoh-

man's treatment of every employee, both Caucasian and African America, suggests that he did not treat Rollins differently and that his treatment of Rollins was not based on his race.

In addition, Hohman never disciplined Rollins. Hohman's supervisors always issued the discipline. Hohman did not terminate Rollins. Thus, it is even unclear to the Court what actions Hohman took to meet the third element of his *prima facie* race discrimination case. Rollins' subjective belief that Hohman's actions were racially motivated is insufficient to show that a constitutional or statutory right was violated. Hence, the Court concludes that Hohman's conduct did not violate Rollins' constitutional or statutory rights.

As to Rollins' claim for retaliation, there is no evidence to show either retaliation or that Hohman terminated Rollins.

As to Rollins' race harassment claim, the Court has already concluded that the combined actions of everyone in the Department, not simply Hohman's actions, were insufficient as a matter of law to support a harassment claim in the Eighth Circuit.

Because Rollins has failed to produce sufficient evidence to show that Hohman violated Rollins' statutory or constitutional rights, Hohman is entitled to qualified immunity.

### B. Motion for Partial Summary Judgment [Doc. # 21]

The Defendants have also sought partial summary judgment on Rollins' request for back pay and medical expenses because Rollins cannot establish that he made a reasonable effort to mitigate his damages after his termination and Rollins cannot establish that he is entitled to medical expenses as he did not see a physician after his termination. Because the Court has granted Defendants' Motion for Summary Judgment, their Motion for Partial Summary Judgment is denied as moot.

### IV. Conclusion

Accordingly, it is hereby

ORDERED that the Defendants' Motion for Summary Judgment [Doc. # 25] is GRANTED. It is further

ORDERED that the Defendants' Motion for Partial Summary Judgment [Doc. # 21] is DENIED as moot.